[No. 3,490.]

# THE CENTRAL PACIFIC RAILROAD COMPANY *v.* THOMAS YOLLAND.

GRANT OF LAND TO CENTRAL PACIFIC RAILROAD COMPANY.—The grant made to the Central Pacific Railroad Company of California, by the Acts of Congress of July 1, 1862, and July 2, 1864, gave to said company and its assigns a title to the odd sections within the limits of the grant which were included within the boundaries of an inchoate Mexican grant, proceedings for the confirmation of which were pending when said Acts were passed, but which was afterwards rejected by the Courts of the United States.

APPEAL from the District Court, Fifth Judicial District, County of San Joaquin.

The grant under which the plaintiff claimed was made to the Central Pacific Railroad Company of California. The said company, soon after 1862, assigned that portion of the grant between Sacramento and San Francisco to the Western Pacific Railroad Company, and, on the 23d of June, 1870, articles of consolidation were filed in the Secretary of State's office, consolidating the two companies under the name of the Central Pacific Railroad Company. The Acts of Congress, on which the plaintiff's title hangs, are found in the Acts of Congress. (12 U. S. Statutes at large, 492; 13 U. S. Statutes at large, 358; 13 U. S. Statutes at large, 504, and 14 U. S. Statutes, 356.) The facts concerning the "Los Moquelumnes" claim and the rejection thereof, are found in the 22 Howard U. S. R. 406, and 2 Wallace, 279. The plaintiff appealed.

The other facts are stated in the opinion.

*J. M. Coats* and *Tully R. Wise,* for the Appellant.

The Acts of Congress referred to in the patent, and under the authority of which it was issued, viz: Act of July 1, 1862; July 2, 1864; March, 1865, and May 21, 1866, granted the land sued for to the Western Pacific Railroad Company. (Sec. 3, Act July 1, 1862, 2 Lester, p. 52; Sec. 4, Act July 2, 1864, 2 Lester, p. 122; Sec. 2, Act March 3,

1865; 2 Lester, p. 139; Joint Resolution of May 21, 1866, p. 203.)

Lands within the exterior boundaries of Mexican grants were not reserved lands or government reservations. A reservation can only be made by an officer having authority to make it.

Lands within the exterior boundaries of void or fraudulent Mexican grants were always a part of the public domain—so says the Supreme Court of the United States, in the case of *Grisar* v. *McDowell* (6 Wall. p. 380).

*McCullough & Boyd,* also, for the Appellant.

The power to reserve public lands from the operation of general laws respecting their disposal, belongs by long prescription to the President of the United States, or those acting under his authority only, unless a statute may specially prescribe or declare a reservation. (Opinion of the United States Supreme Court in *Grisar* v. *McDowell,* 6 Wallace Rep. p. 381.) We argue that as no reservation was ever ordered by proper or any authority to protect the forged Moquelumnes claim, none existed. No reservation can be presumed in the absence of an executive order to create one. There is no law cited or relied upon as declaring a reservation of the lands in contest, except the words in section 13 of the Act of March 3, 1851, in relation to private land claims, prescribing that the lands to which claims shall be finally rejected "shall be deemed, held and considered as part of the public domain of the United States." As these do not create any reservation by direct prescription, we remark, that if they do create reservations by implication, this instance is the first in which such a result has been attained by implication. The United States Supreme Court, in all the cases, and in its latest and recent general decision and discussion on the subject, hereinbefore quoted, proceeds upon the principle that the power to reserve lands must be directly exercised by Congress or the executive, or it cannot be claimed that a reservation had been made. Reservations do not exist by implication.

In *Wilcox* v. *Jackson* (13 Pet. 498), there was an order of

reservation. From 1804, the land had been appropriated under the Acts of 1798, 1806, and 1809, authorizing the President to establish "fortifications, trading posts for Indians," etc. Then, in 1824, the Commissioner of the General Land Office, at the request of the Secretary of War, ordered the land reserved, and this reservation excepted it from the provisions of the Pre-emption Act of 1830. (See p. 512-13.)

Jackson did not prove up and pay till 1835. In *United States* v. *Fitzgerald* (15 Pet. 420), Fitzgerald pre-empted under the Acts of 1830 and 1834, and paid up. Then, after that, and in 1836, the Commissioner ordered a reservation. Of course, that was too late to cut off Fitzgerald's vested rights. And the Court say there must be an order of reservation under an Act of Congress.

In *United States* v. *Stone* (2 Wallace, 527), there was an order of reservation.

"The land claimed was not severed from the public domain by the Spanish authorities, and set apart as private property; and, consequently, it passed to the United States by treaty, which ceded to them all the public and unappropriated lands." (Chief Justice Taney in *U. S.* v. *King*, 3 Howard, 786.)

The same doctrine was stated in *United States* v. *Forbes* (15 Peters, 173; also, 15 Peters, 215). An unsurveyed Spanish grant in Florida did not separate any particular tract from the public domain. (*United States* v. *Miranda*, 16 Peters, 154.)

√ "In the case of an imperfect Spanish title to land in Louisiana, a confirmation by Congress is inoperative, unless the title or survey under it will enable the Court to ascertain the specific boundaries of the land. If, before the survey in such a case, an entry is made and a patent taken out for the land, which conflicts with a subsequent survey of a confirmed concession, the patentee has the better title." (*Ledoux* v. *Black*, 18 How. 473.)

In the foregoing case, the grant was dated January 10, 1796, confirmed 11th May, 1820, by Congress, and surveyed to include lands patented by the United States in 1810; but

the title of the patentee was sustained against the confirmation, and the foregoing was held to be the settled doctrine of the United States. (*Menard's Heirs* v. *Massey*, 8 How. 301.)

*D. S. Terry*, for the Respondent.

The word reserved has a plain, well understood signification. Reserve is defined by Webster: "To keep for future or other use; to retain to make exception of; to except."

Reserve (a noun), "That which is reserved or kept back; that which is excepted."

Webster then uses "reserved" and "excepted" as synonymous. And this is the general acceptation of the word in the connection in which it is used in the Acts of Congress referred to.

If I sell to A. all of block one except lot ten, all persons would understand that lot ten was reserved. The Act of March 3, 1853, provides "that all public lands in California, surveyed or unsurveyed,     *     *     *     excepting also the lands claimed under any foreign grant or title,     *     *     *     shall be subject to the pre-emption laws of September 4, 1841." There can be no doubt that in passing the Act of March 3, 1853, which subjected the public lands in California to the pre-emption law of September 4, 1841, Congress intended that all lands claimed under a Mexican grant should be reserved, that they should be "kept back for future or other use," and should remain in the same condition they then were until the claim was finally passed upon by the Courts, under the provisions of the Act of March 3, 1851, "to ascertain and settle private land claims in the State of California."

The Government of the United States, by the treaty of Guadalupe Hidalgo, pledged its faith that the property of Mexican citizens in the ceded territory should be "inviolably respected." That such of them as chose to remain in the ceded territory should be "maintained and protected in the free enjoyment of their liberty and property." (Treaty of Guadalupe Hidalgo, Article 9.) Much and by far the

most valuable portion of the property of the Mexicans residing in California consisted in lands granted by the former Government, and in order to protect them in the enjoyment of this property it was absolutely necessary that it should be reserved from sale or disposition by the United States, until the claims of Mexican citizens should have been finally determined by the tribunals provided for that purpose by the Act of March 3, 1851, and this reservation is clearly and distinctly made in section 6 of the Act of March 3, 1853. (1 Lester, 207.) Appellant's second point, that in order to constitute a reservation "there must be an order withdrawing or reserving the lands," is answered by the decisions of this Court in a series of cases involving the rights of purchasers on the Suscol ranch, under the Act of Congress passed March 3, 1863. (2 Lester, 78.) There was no "order withdrawing or reserving" the lands embraced in said Act, yet this Court held that by virtue of the statute itself they were reserved from the operation of the pre-emption laws. (*Hastings* v. *McGoogan*, 27 Cal. 85; *Paige* v. *Hobbs*, Id. 487; *Paige* v. *Fowler*, 28 Cal. 609; *People* v. *Shearer*, 30 Id. 650; *Hutton* v. *Frisbie*, 37 Id. 409.) But no authority is required for the proposition that Congress may do that directly, which it can authorize the Executive Department to do, and that when reservation is made by statute no order from any executive officer is necessary to give effect to the statute.

We say then that the land in contest was reserved in July, 1862, and the reservation continued until February 13, 1865, when the claim was finally rejected by the Supreme Court of the United States. The effect of this rejection was to restore the land embraced in the claim of Pico to the mass of public domain, and it then became subject to diposition under the Act of September 4, 1841. (*Rush* v. *Casey*, 39 Cal. 342; *McGary* v. *Hastings*, Id. 368; Sec. 13 of Act of March 3, 1851; 1 Lester, 177.) The question as to the right of plaintiff to lands claimed under a Mexican grant has been before the United States Land Department, and their construction of the Acts of 1862 and 1864 granting lands in aid of the construction of the Pacific Railroad is that which respondent contends for.

The question first arose in the case of *Michael Coyne* v. *The Western Pacific Railroad and others,* which was decided May 20, 1869.  (Zabriskie's Land Laws, p. 103.)  The land in controversy in that case was claimed at the time of the location of the road as part of a Mexican grant, the "Pastoria de las Boregas," but was excluded from the final confirmation, which was June 26, 1865.  The land then formed no part of the Pastoria de las Boregas though within the external boundaries of the tract claimed by Castro, the grantee.  The Commissioner of the General Land Office held that:  "At the date of the grant (to the railroad) and the withdrawal (for railroad purposes) the lands were not public lands open to disposal, they were claimed as part of a Mexican grant *sub judice* and then unadjusted, and were reserved from disposal by the United States in any manner whatever; but upon the final adjudication of the grant and its survey, they became for the first time a part of the public domain, and subject to be dealt with as such under the Act of March 3, 1853, and they do not pass under the grant to the railroad, made in 1862 and 1864, of lands that were then public, as these tracts did not become public until the 26th of June, 1865."  The question again arose in the case of *Sargent and Tredway* v. *The Western Pacific Railroad Company,* embracing lands in the immediate vicinity of and included in the same rejected Mexican grant as the land in controversy in this action.

The Secretary of the Interior rendered a decision on the 7th of July, 1870, adverse to the claim of the railroad company.  He held that the lands embraced in the Pico or Moquelumnes grant were reserved, and by reason of the pending and undetermined claim they could not be "deemed, held and considered as a part of the public domain," in such a sense as that a grant in general terms would attach to them, and that they were not released from reservation till the final rejection of the claim by the Supreme Court of the United States.  He says, "it cannot be doubted that the lands in question were reserved from ordinary sale or location, or from appropriation under the pre-emption laws, and being thus reserved from the public

domain, no subsequent law, unless specifically and in clear and unquivocal terms applicable to them, would be construed to embrace them, or operate upon them." Such is the opinion of the Supreme Court in the case of *Wilcox* v. *Jackson* (13 Peters, 498), and I think it must detemine the question.

By the Court, RHODES, J.:

This is an action of ejectment to recover the possession of the north-west quarter of the north-west quarter of section 33, town 3, north of range 6 east, Mount Diablo base and meridian. The plaintiff claims title under a patent issued by the United States to the Western Pacific Railroad Company, on the 9th day of April, 1870, in pursuance of the Acts of Congress of July 1, 1862, July 2, 1864, and March 3, 1865, and the joint resolution of May 21, 1866, to aid in the construction of a railroad and telegraph line, from the Missouri river to the Pacific ocean. The land is within the twenty-mile limits, on each side of the road, and within the limits of the reservation made by the Commissioner of the General Land Office on the 23d day of December, 1864.

The land is within the exterior limits of an alleged Mexican grant of eleven leagues of land, called the "Los Moquelumnes," and claimed by Andreas Pico, who executed to the defendant a deed purporting to convey the land. The claim of Pico was finally rejected by the Supreme Court of the United States, on the 13th day of February, 1865. The defendant has been in the possession of the land since 1865, and after the passage of the Act of Congress of July 23, 1866, he made proof of his claim in compliance with said Act, and paid for the land, and on the 5th day of October, 1871, the United States issued to him a patent therefor.

The action was tried by the Court, without a jury, and the Court, without filing any findings of fact, decided for the defendant, and judgment was entered accordingly; and afterwards the plaintiff's motion for a new trial was denied.

The question involved in the case is, whether lands

claimed under a grant made by the Mexican Government, the claim to which was pending in the Courts of the United States, when the Acts of Congress to aid in the construction of the railroad above referred to were passed, and which was finally rejected by the Supreme Court of the United States, were reserved from the grant of lands to the railroad company.

The Act of July 1, 1862, grants "every alternate section of public land, designated by odd numbers, to the amount of five alternate sections per mile, on each side of said railroad on the line thereof, and within the limits of ten miles on each side of said road, not sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim may not have attached at the time the line of said road is definitely fixed."

The Act of July, 2, 1864, provides that the lands granted "shall not defeat or impair any pre-emption, homestead, swamp land or other lawful claim, nor include any government reservation or mineral lands, or the improvements of any *bona fide* settler," etc.

The only words in these Acts upon which the defendant can rely as excluding the lands in this case from the grant to the railroad, are the words "reserved    *    *    * by the United States," in the Act of 1862; and the words " any Government reservation," in the Act of 1864; that is to say, if the lands are not reserved by the United States, or did not form a portion of a Government reservation, they were included in the grant to the railroad.

In our opinion, the lands are not reserved by the United States, nor did they constitute a portion of a Government reservation, within the meaning of the words of the Act of Congress above mentioned.

It is unnecessary at this time, to enter upon an argument to sustain this construction of the Acts of Congress; for there are many tracts of land in this State, the title to which depends upon the interpretation to be given to those Acts; and the parties in interest, it may be assumed, will apply to the appropriate tribunal, the Supreme Court of the United States, for a final determination of the question.

There being no finding, nor an agreed statement of the facts upon which the plaintiff's title depends, and the implied findings being in favor of defendant—the cause having been tried before the Code of Civil Procedure took effect—judgment cannot be ordered to be entered in favor of the plaintiff, without a violation of a well recognized rule of practice.

Judgment and order reversed, and cause remanded for a new trial.